**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| ANDRE LEE HILLIARD, | |
| Plaintiff, | |
| v. | |
| CTOS CARLOS MARISCAL, CTO, TIMOTHY HINES, CTO ARNOLD COATES, CTOS ANDREW CREWS, CTO AMANDA FREEMAN, CTOS COREY WALKER, LSW LINDSAY LEADINGHOUSE, N.P. OLADIMEJI KASSIM, IDOC, LATOYA HUGHES | Case No. 23-CV-00562 <br><br> Judge Mary M. Rowland |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Andre L. Hilliard sues two mental health professionals ("Wexford Defendants) and various Correctional Officers ("IDOC Defendants") under the Eighth Amendment, alleging that they were deliberately indifferent to his serious mental health needs, and IDOC and IDOC Director Latoya Hughes (in her official capacity) in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, *et seq.*, and the Rehabilitation Act ("RA"), 29 U.S.C. § 794, *et seq.* [78] ("third amended complaint"). All Defendants move now for summary judgment. [155]; [158]. For the reasons explained below, this Court grants the Wexford Defendants' motion for summary judgment [155]; and grants in part and denies in part the IDOC Defendants' motion for summary judgment. [158].

1

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

2

## BACKGROUND

### I. Defendants' request to admit undisputed facts and strike several of Plaintiff's additional statements of facts

As a preliminary matter, Defendants request the Court to admit all of their statements of fact that Plaintiff has not responded to. [173] at 1-6; [174] at 1-4. It is well established that "Local Rule 56.1's enforcement provision provides that when a responding party's statement fails to controvert the facts as set forth in the moving party's statement in the manner dictated by the rule, those facts shall be deemed admitted for purposes of the motion." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). This Court maintains broad discretion to enforce the Local Rules governing summary judgment motions. *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008).

Here, the Court relies on and admits statements of fact to the extent they are relevant to resolving the summary judgment motion, and the Court will only consider facts that are properly supported by admissible evidence. *See* FED.R.CIV.P. 56(e); LR 56.1. Additionally, the Court reviews the materiality of facts submitted by all parties, and to the extent any facts are immaterial or irrelevant to the Court's analysis, the Court does not recite those facts or consider them in reaching the merits of the motion. Where parties submit properly supported contradictory facts or admissible facts that create a material factual dispute, the Court notes the contradiction and considers both sets of facts. To the extent Defendants' facts are relevant and not disputed (or not responded to) the Court treats them as admitted and considers them.

Turning to Plaintiff's additional statements of facts numbered 41-53, the Court admits those facts to the extent that they are material to resolving the merits of the motions, and to the extent that they are supported by admissible evidence. FED.R.CIV.P. 56(e); LR 56.1. Plaintiff concedes that he did not receive prior leave of Court for the additional 13 facts in his single filing, but explains that he is responding to two separate statement of facts and filed one omnibus additional statement of facts to streamline the record, not to circumvent the rules. [176] at 2-3. Plaintiff has also clarified his factual disputes through his additional statements of fact. *Id*. The Court therefore permits Plaintiff's additional facts, numbered 41-53, to the extent that they are material and properly supported.

With these issues resolved, this Court summarizes the pertinent facts, taken from Defendants' statements of facts [156] ("Wexford SAOF"); [159] ("IDOC SAOF"), Plaintiff's statement of additional facts [167] ("PSOAF") and clarification [176], and Defendants' responses to Plaintiff's statements of additional facts. [171] ("IDOC RPSOAF"); [172] ("Wexford RPSOAF"). The Court notes where there are factual disputes in the record.

## II. Facts

Plaintiff Andre L. Hilliard was incarcerated within the Illinois Department of Corrections ("IDOC") at the Joliet Treatment Center ("JTC"), a specialized facility within IDOC for individuals with mental illness between August 12, 2022, through August 15, 2022. [156] ¶¶ 6, 16; [159] ¶¶ 1, 74. During the relevant time, Defendants Oladimeji Kassim, a licensed psychological nurse practitioner ("NP"), Lindsay

4

Leadinghouse, a licensed social worker ("LSW"), Carlos Mariscal, a Correctional Treatment Officer Supervisor ("CTOS"), Andrew Crews, a CTOS, Arnold Coates, a Correctional Treatment Officer ("CTO"), Amanda Freeman, a CTO, Timony Hines, a CTO, and Corey Walker, a CTOS, worked at JTC. [156] ¶¶ 3-4; [159] ¶¶ 2-7. Director Hughes was the acting IDOC director at the relevant time. [159] ¶ 8.

Plaintiff has longstanding psychiatric disabilities, including post-traumatic stress disorder (PTSD), depression, and bipolar disorder, substantially limiting major life activities. [167] ¶ 1. Defendants Leadinghouse and Kassim worked as mental health professionals. [156] ¶¶ 3-4. At JTC, individuals may be placed on crisis watch if there is a potential that they are a threat to themselves or to others. *Id.* ¶ 19.

### *Plaintiff obtains a remote*

On August 12, 2022, Plaintiff was placed on crisis watch after reporting suicidal thoughts. *Id.* ¶ 20; [167] ¶¶ 2-3. According to IDOC Defendants, Plaintiff asked to be placed on crisis watch immediately after being taken to the restrictive housing wing upon receiving a disciplinary ticket. [159] ¶¶14, 17, 19-23. The crisis wing is intended to ensure immediate safety and stabilization, and staff are required to remove any item that could be used for self-harm. [167] ¶ 4. Before placement in a crisis cell, IDOC policy requires an unclothed search and shakedown of the cell to ensure no contraband is present. *Id.* ¶ 5. Plaintiff was strip searched prior to being transferred into his assigned cell by correctional officers. [156] ¶ 21. Additionally, upon Plaintiff's arrival to the crisis wing, Defendant Kassim entered the property-

5

restriction order limiting Plaintiff's property to a safety smock, safety blanket, and safety mattress. *Id.* ¶ 7.

On August 12, 2022, Defendant Mariscal was assigned to Dorm 8 for the 3 pm-11 pm shift. *Id.* ¶ 27. Plaintiff was placed in cell #9 on B-wing, which was located in Dorm 7, from August 12, 2022, until he was moved to cell #2 on D-wing of Dorm 7 on August 15, 2022. *Id.* ¶ 24. Defendant Mariscal was not involved in moving Plaintiff on August 12, 2022. *Id.* ¶ 29. Although Defendant Mariscal was assigned to Dorm 8, it is undisputed that he could respond to Dorm 7. [167] ¶ 9.

Plaintiff testified that when he arrived on the crisis wing, Defendant Mariscal told him to "kill [him]self" and placed a television remote in his cell. [167] ¶ 10. This was the first time Defendant Mariscal ever spoke to or interacted with Plaintiff. [159] ¶ 38. It is undisputed that Dorm 7 crisis cells did not contain televisions or TV remotes, and all TV remotes were controlled by officers and were stored in the control center. [167] ¶ 11; [171] ¶ 11; [172] ¶ 11.

After Defendant Mariscal left the remote in his cell, Plaintiff testified that (1) he became extremely distraught and anxious, (2) he believed staff were mocking his condition, and (3) he had thoughts of killing himself. [167] ¶¶ 15-16. Defendant Mariscal denies making the statement and denies providing Plaintiff with a TV remote. [159] ¶¶ 32-33. The record indicates that an IDOC counselor documented "Per CTO S. Mariscal: Upon arrival of [the mentioned date], I was on ERT ["Emergency Response Team"] and the *Dorm 7* CTOS on August 12." [167] ¶ 13

6

(emphasis added). At his deposition, Defendant Mariscal acknowledged this was documented in the record, but testified that he "misspoke". *Id.* ¶ 14.

Plaintiff was seen by an unnamed mental health professional on August 13, 2022. [156] ¶ 22. The following day, August 14, 2022, Plaintiff was non-compliant with his psychiatric medication, an antipsychotic medication, which stabilized his moods. *Id.* ¶ 23. Plaintiff's medication helps him control impulsive, compulsive, and disruptive behaviors. *Id.* ¶ 24. Non-compliance with Plaintiff's medication can result in disruptive and unruly behavior, and difficult management. *Id.* ¶ 25. Defendant Mariscal was not at the facility on those dates. [159] ¶ 37.

*The first self-harm incident*

As a licensed social worker, Defendant Leadinghouse is sometimes tasked with conducting a daily assessment of an individual on a crisis watch. [156] ¶ 29. At approximately 9:30 am on August 15, 2022, Defendant Leadinghouse assessed Plaintiff. *Id.* ¶ 29. Upon arriving, Plaintiff told Defendant Leadinghouse that he wanted to die, security wanted him to die, and that they gave him contraband. *Id.* ¶ 31. Defendant Leadinghouse testified that she asked him what contraband he possessed, and after an initial lack of response, Plaintiff asked her if she wanted to see what he had. *Id.* ¶ 32. He then bent over, picked up a part of headphones, and proceeded to swallow it. *Id.* Plaintiff then picked up AAA batteries and swallowed them. *Id.* Defendant Leadinghouse verbally attempted to stop him. *Id.* ¶ 39. Plaintiff further smashed the tv remote on the floor and cut his arm near his elbow with the broken pieces. *Id.*; [167] ¶ 17. Plaintiff testified there was nothing Defendant

Leadinghouse could have done to stop him. [156] ¶ 34. The other Defendants did not know that Plaintiff was in possession of contraband or that he intended to self-harm with it. [159] ¶ 46.

Immediately after this incident, Defendant Coates told Plaintiff to "cuff up" and Plaintiff refused. [156] ¶ 35. According to the Wexford Defendants, a tactical team was called, and Plaintiff threw the remote out of his cell by the time the team arrived at his cell. *Id.* ¶ 35. Defendants maintain that Defendant Coates performed a shakedown of Plaintiff's cell after his self-harm incident and removed all the remote-control items and pieces from Plaintiff's cell. [159] ¶ 51; [156] ¶ 37; [167] ¶ 19. According to IDOC Defendants, Plaintiff was offered medical attention after his first attempt at self-harm, but he refused it. [159] ¶ 48; [156] ¶ 47. The record shows that Plaintiff stated "[b]itch I don't want no assessment", which he did not deny at his deposition. [156] ¶ 48. Nevertheless, Plaintiff was psychologically revaluated and taken to a holding bullpen for further medical and mental health evaluation. *Id.* ¶ 49; [156] ¶ 36. At that time, Defendant Leadinghouse notified Defendant Kassim of the incident, and later consulted with a licensed clinical social worker to confirm Plaintiff would remain on a 10-minute crisis watch. [156] ¶ 38. Defendant Leadinghouse required higher level providers to approve crisis watch settings. *Id.* She testified that this is because she only has a three-letter license, LSW, and supervisors have a four-letter license, Licensed Clinical Social Worker, or doctorate. *Id.* Defendant Leadinghouse must therefore get approval from a higher-up with a clinical background. *Id.*

8

Defendant Kassim encountered Plaintiff while he was in the bullpen from approximately 9:40 am to 10:00 am on August 15, 2022. *Id.* ¶ 39. Defendant Kassim had familiarity with Plaintiff's past maladaptive behaviors, and Plaintiff reported that he was upset about receiving a disciplinary ticket. *Id.* ¶¶ 40-41. Plaintiff further denied suicidal or homicidal ideations, or the urge to engage in self-harm. *Id.* ¶ 42. During Plaintiff's assessment, Defendant Kassim determined that Plaintiff was continuing a display of poor coping and use of maladaptive and self-defeating behaviors. *Id.* ¶ 43. In his professional opinion, Plaintiff was exhibiting symptoms consistent with his diagnosis of antisocial personality disorder. *Id.* ¶ 44. Defendant Kassim planned for Plaintiff to continue with the current mental health treatment plan given that Plaintiff could contract for safety. *Id.* ¶ 45. Defendant Kassim did not order medical imaging or clearance for the ingested batteries, stating that such orders would be issued by a medical doctor. [167] ¶ 45.

*The second self-harm incident*

According to Plaintiff, when he was returned to his crisis cell later that day, pieces of the broken remote remained on the floor. *Id.* ¶ 20. Defendant Leadinghouse testified at approximately 11:12 am, she was still in the area and Plaintiff called her over, telling her he was going on a hunger strike so the batteries could burst in his stomach. [156] ¶ 49. Defendant Leadinghouse encouraged him to eat food, but he refused his lunch tray. *Id.* Defendant Leadinghouse notified IDOC staff of the situation and Plaintiff's hunger strike. *Id.* ¶ 51. The IDOC Defendants continued to monitor Plaintiff according to the 10-minute watch schedule he was placed on. [156]

¶ 52. At some point after Defendant Leadinghouse left Plaintiff's cell, Plaintiff began bleeding from his arm again and CTO Coates noted blood seeping under Plaintiff's door. *Id.* ¶¶ 53-54. Plaintiff testified that he remained distraught, he had not received meaningful mental health treatment, and he again used the remaining fragments of the remote to cut his arm. [167] ¶ 21. According to IDOC Defendants, at 12:40 pm, Plaintiff told Defendant Coates that he used his fingernail to open a wound on his arm and his fingertip and nail appeared bloody. [159] ¶ 57; [156]; ¶ 54. Plaintiff testified that he remained distraught, he had not received meaningful mental health treatment, and he again used the remaining fragments of the remote to cut his arm. [167] ¶ 21. It is undisputed that Plaintiff received medical care after his second self-harm attempt. [167] ¶ 22; [159] ¶ 56; [156] ¶ 55.

Based on Plaintiff's prior acts of self-harm and his current inability to contract for safety, coupled with his reported intent to continue self-harming, Defendant Kassim ordered Plaintiff placed in four-point restraints. [156] ¶¶ 56-58; [167] ¶ 22. At 12:45 pm, Defendant Kassim placed an order for the restraints to be applied for four hours per JTC protocol. [156] ¶ 59; [167] ¶ 25. Per the protocol, a patient must first be able to contract for safety prior to the removal of the four-point restraints. [156] ¶ 59. At 1:07 pm, Plaintiff was transported to a specific wing of the JTC used for patients with four-point restraints. *Id.* ¶ 60. At 4:15 pm, Defendant Kassim entered an order extending the time for the four-point restraints because Plaintiff was still unable to contract for safety. *Id.* ¶ 62. Defendant Kassim made this determination in his professional judgment as a nurse practitioner in order to

10

maintain the safety of Plaintiff and others. *Id*. Plaintiff remained in restraints until the following morning, about twenty hours in total. [167] ¶ 25.

*Plaintiff spits an object out onto the floor while in restraints*

Defendants Hines, Walker, and Freeman performed a limb rotation on Plaintiff at 6:30 pm, during dinner, on August 15, 2022. [159] ¶ 62.[1] According to IDOC Defendants, during Plaintiff's dinner and limb rotation, Plaintiff spit an object resembling a sharp piece of metal or a mirror, out of his cheek and accused staff of placing it in his food. *Id*. ¶ 63; [156] ¶ 63. Plaintiff testified that the object came from his food. [167] ¶ 29. Defendants Hines and Freeman documented the dinner incident in their respective incident reports and indicated that: (1) none of the Defendants placed any item in Plaintiff's food and (2) they had no knowledge Plaintiff was in possession of contraband that evening. [159] ¶¶ 64-65. The record supports that Plaintiff was found guilty in a disciplinary ticket issued on August 15, 2022, for dangerous contraband and giving false information to an employee after he dug into his cheek, spat out an object, and accused staff of putting an object in his food during his limb rotation. *Id*. ¶ 66; [156] ¶ 63. The record further supports that Plaintiff received periodic limb rotations, except where he himself refused them. [159] at 671, Exhibit 20 (Plaintiff's crisis care log).

Plaintiff continued to have and express suicidal thoughts that night and remained on crisis watch. [167] ¶ 34. Defendant Kassim made the professional judgment to extend Plaintiff's restraints for 16 more hours. [156] ¶ 64. Plaintiff was

---

[1] Defendant Mariscal was not involved in any of Plaintiff's limb rotations on August 15, 2022. *Id*. ¶ 61.

released from his restraints on the morning of August 16, 2022, at approximately 8:15 am when he was calm, relaxed, cooperative, and able to contract for safety. [167] ¶ 35; [156] ¶¶ 64, 68. Although Defendant Kassim did not terminate the extended restraint order, it *could* be done if the patient presented with improvements and an ability to contract for safety. [156] ¶ 65. Defendant Kassim's shift ended at 6:00 pm on August 15, 2022, but 24-hour nursing staff and an on-call psychiatric provider were on call to terminate the restraints if appropriate. *Id.* ¶ 66.

*Duties of correctional officers*

Correctional officers at JTC conduct body searches and cells to ensure compliance with crisis watch property restrictions. Mental health staff do not conduct those searches. [156] ¶ 26. Correctional officers are also tasked with conducting the 10-minute watches. *Id.* ¶ 27. They make visual and verbal contact with the prisoner to make sure the person is not in crisis. *Id.*; [159] ¶ 42. Correctional officers, not mental health staff, are responsible for the placement of four-point restraints, for conducting limb rotation, and for the instruction of both procedures. [156] ¶ 61. Medical staff assist correctional staff with the initial four-point restraints as well as hourly periodic limb rotations to ensure proper circulation. *Id.*

*Plaintiff's mental health treatment plans*

Plaintiff receives mental health care, including daily crisis care assessments, psychiatric care for his mental health conditions, and treatment by psychologists, qualified mental health professionals, and nurse practitioners. [159] ¶ 76. He received this care in August of 2022 and received mental health treatment when he resided in

12

restrictive housing. *Id.* ¶¶ 76-78. Plaintiff was receiving treatment in JTC's behavioral management unit, a program offered by the facility focusing on treatment and building residential skills to help patients make better decisions. *Id.* ¶ 77.

Plaintiff brings his third amended complaint under 42 U.S.C. § 1983 alleging that Defendants were deliberately indifferent to his serious mental health crisis, failed to ensure Plaintiff received proper mental health care, and failed to protect Plaintiff in contravention of the Eighth Amendment, and further alleging that IDOC and IDOC Director Hughes (in her official capacity) violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794, *et seq.* [78] Defendants deny liability and move for summary judgment. [155]; [158].

## ANALYSIS

All Defendants move for summary judgment. Wexford Defendants argue that Plaintiff has not demonstrated they were deliberately indifferent, [157] at 7-11, and IDOC Defendants argue (1) that they did not possess the requisite subjective intent for liability to attach, and (2) there is no evidence that Plaintiff was discriminated against on the basis of his mental disabilities. [160] at 5-16. The Court analyzes each set of claims in turn below.

### I.      Standards

#### A. *Eighth Amendment*

To present a viable Eighth Amendment claim, Plaintiff must show (1) that he had an objectively serious mental health condition, and (2) that Defendants were

13

subjectively aware of, *and consciously disregarded*, a risk to his health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (emphasis added). The state of mind, or subjective element, requires that the defendant must know of facts from which he could infer that serious harm exists, *and he must also draw that inference. Id*; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. Aug. 25, 2016) (en banc) ("[T]he Supreme Court has instructed us that a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm."). Deliberate indifference requires a culpable state of mind, akin to criminal recklessness. *Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2006). Plaintiff must show the particular defendant's mental state is "something approaching *a total unconcern* for [Plaintiff's] welfare in the face of serious risks." *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992) (emphasis added). The Seventh Circuit has explained that this is a high bar. *Rasho v. Jeffreys,* 22 F.4th 703, 710 (7th Cir. 2022).

A mistake in professional judgment alone cannot amount to deliberate indifference. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). "Officials can avoid liability by proving they were unaware even of an obvious risk to inmate health or safety." *Petties*, 836 F.3d at 728 (7th Cir. 2016) (internal citation omitted). "[P]rison officials who are aware of a substantial risk of serious harm may not be held liable if they responded reasonably to the risk, even if the harm was not ultimately averted." *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000) (citing *Farmer*, 511 U.S. at 844).

14

"To state a failure to protect claim, a plaintiff-inmate must allege that (1) 'he is incarcerated under conditions posing a substantial risk of serious harm,' and (2) defendant-officials acted with 'deliberate indifference' to that risk." *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005) (quoting *Farmer* 511 U.S. at 834 (1994)). "To satisfy the first, objective prong, a plaintiff must show not only that he experienced, or was exposed to, a serious harm, but also that there was a substantial risk beforehand that the serious harm might actually occur." *Johnson v. Clark*, No. 18-cv-08090, 2022 WL 971997, at *6 (N.D. Ill. Mar. 31, 2022) (citing *Brown*, 398 F.3d at 910). Where the harm at issue is suicide, the objective element is met. *Id*. (cleaned up). The second, subjective element, requires a showing that the defendant had actual knowledge for liability to attach. *Id*. (citing *LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. 2020); *see also Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006) (the plaintiff must show that the defendant (1) subjectively knew the prisoner was at substantial risk of committing suicide, and (2) intentionally disregarded that risk).

## B. ADA and Rehabilitation Act ("RA")

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C § 12132. Similarly, Section 504 of the RA prohibits a "qualified individual with a disability" from being "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity," as a result of his disability. 29 U.S.C. § 794(a). Relief under the

15

ADA and the RA is coextensive and the analysis under each statute is materially the same. *Jaros v. Ill. Dep't of Corrs*, 684 F.3d 667, 671–72 (7th Cir. 2012). For the RA to apply, the relevant state agency, the Illinois Department of Corrections here, must accept federal funds, which all states do. *Id.* at 671. The Court analyzes the claims together because the standards under the ADA and the RA are functionally identical, referring predominantly to the ADA.

To state a claim under Title II of the ADA, Plaintiff must allege that he: (1) is a qualified individual with a disability; (2) that he was denied the benefit of services, programs, or activities of the public entity or otherwise subjected to discrimination by such an entity; and (3) the denial or discrimination was "by reason of" his disability. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (quoting *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996)).

## I.     The Eighth Amendment Claim: The Wexford Defendants were not deliberately indifferent to Plaintiff's mental health needs

The Wexford Defendants argue that Plaintiff cannot prove they were deliberately indifferent because (1) Plaintiff refused to comply with orders and follow instructions by his mental health providers, (2) they are not responsible for conducting cell and body searches, (3) Plaintiff has failed to offer evidence that the Wexford Defendants' actions fell below the applicable standard of care, and (4) Plaintiff cannot prove either Wexford Defendants proximately caused him injury. [157] at 9-13. Plaintiff responds that Defendant Leadinghouse failed to verify that the cell had been cleared or followed up on Plaintiff's mental health and safety, and Defendant Kassim similarly failed to ensure a safe environment or conduct a follow

16

up evaluation before Plaintiff returned to his cell. Additionally, Defendant Kassim authorized and extended Plaintiff's four-point restraints without re-evaluating him, which could amount to deliberate indifference. [168] at 5-8. The Court agrees with the Wexford Defendants.

Here, importantly, Plaintiff has failed to prove that either Defendant Leadinghouse or Defendant Kassim consciously disregarded a risk to his safety. In fact, the record shows the opposite, explained *infra*.

### A. Defendant LSW Leadinghouse

Defendant Leadinghouse was a licensed social worker who approached Plaintiff's cell on August 15, 2022, to perform an assessment of his mental state while he was placed on crisis watch. Upon her arrival, Plaintiff immediately self-harmed. Defendant Leadinghouse alerted correctional staff immediately and tried to stop Plaintiff from continuing his self-harm. Indeed, Plaintiff himself testified that there was nothing she could do to stop him. These facts weigh against a conscious disregard for Plaintiff's safety.

Further weighing against deliberate indifference, when Plaintiff returned to his cell, Defendant Leadinghouse tried to convince him to eat, and quickly notified correctional staff of Plaintiff's plans to engage in a hunger strike. Viewing the record in the light most favorable to Plaintiff, as the Court must, there is no evidence that Defendant Leadinghouse consciously disregarded a risk to his safety. On the contrary, the record supports that Defendant Leadinghouse attempted to prevent

17

Plaintiff further harm. *See e.g. Petties*, 836 F.3d at 728 (deliberate indifference requires that a defendant actively disregard a substantial risk of harm).

Plaintiff's argument that Defendant Leadinghouse should have verified that his cell had been cleared of additional items or checked on his mental health status and safety is unpersuasive. At top, Defendant Leadinghouse is not responsible for checking Plaintiff's cell—correctional staff are. *See Adams v. Reagle*, 91 F. 4th 880, 894-95 (7th Cir. 2024) ("[T]here is no evidence that [Defendants'] positions within the prison charged them with any responsibility for the conditions in that unit or gave them the authority to change those conditions….[c]onsequently, they cannot be held to account for the conditions [plaintiff] has described."). Furthermore, she *did* check on his status by talking with him (even though she was not assigned to conduct a mental health assessment at that time), and she notified staff of his hunger strike, attempting to ensure he was safe. The cases Plaintiff cites do not require a different conclusion. In *Collins v. Seeman*, 462 F.3d at 762, the Seventh Circuit found that the defendant officer was *not* deliberately indifferent, reasoning that the record demonstrated the defendant (like Leadinghouse) "immediately informed" others and did not "sit idle". *Id*. This case cited therefore does not support Plaintiff's proposition. *Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015) likewise fails to persuade because it was decided at a different procedural stage. *Id*. (emphasizing that the claims should be allowed to proceed to discovery and these questions of fact "simply cannot be resolved in the absence of a record.").

In sum, because Plaintiff is unable to prove the second element—that Defendant Leadinghouse consciously disregarded a risk to Plaintiff's safety—the claim against Defendant Leadinghouse fails. Accordingly, the Court grants summary judgment as to Defendant Leadinghouse.

### B. *Defendant NP Kassim*

Turning to Defendant Kassim, the record similarly is devoid of evidence that he disregarded a substantial risk of harm to Plaintiff. On the contrary, the record once again shows the opposite. As Plaintiff's psychiatric nurse practitioner, Defendant Kassim was familiar with Plaintiff's mental health status and the accompanying symptoms he presented; he was aware of Plaintiff's maladaptive and disruptive behavior, and he had knowledge that Plaintiff engaged in self-harm.

Upon admittance to the crisis watch unit, in an effort to keep Plaintiff safe given his history, Defendant Kassim entered the property-restriction order limiting Plaintiff's property to a safety smock, safety blanket, and safety mattress. When Plaintiff self-harmed by cutting his arm with remote pieces and ingesting batteries, Defendant Kassim evaluated Plaintiff and determined that Plaintiff's 10-minute crisis watch could continue because he was able to contract for safety. After Plaintiff's second self-harm attempt, due to Plaintiff's repeated incidents within a few hours of each other, Defendant Kassim determined Plaintiff should be placed in four-point restraints for his safety. This was an appropriate professional judgment given (1) all the information he had at the time, and (2) that Plaintiff expressed he would continue to self-harm. The four-point restraints were extended because Plaintiff was unable to

19

contract for safety, which was also a decision meant to *prevent* further harm. Plaintiff has not presented any evidence that Defendant Kassim disregarded a substantial *risk* of harm to Plaintiff. Put another way, Defendant Kassim's decisions were meant to protect Plaintiff, including from himself, and therefore cannot meet the high bar of deliberate indifference. Additionally, there is no evidence to indicate that Defendant Kassim's decisions, based on his professional judgment, are a substantial departure from the accepted practice such that the Court can infer subjective awareness. (Plaintiff did not present any expert testimony.) *See e.g. Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 262 (7th Cir. 1996) (deliberate indifference may be inferred when the medical professional's decision is such a substantial departure from accepted judgement, practice, or standards as to demonstrate the person did not base the decision on sound judgment).

Plaintiff's argument that Defendant Kassim should have known Plaintiff possessed contraband in his cell upon his return is unpersuasive—he was not responsible for checking Plaintiff's cell. The extended restraint order without another documented psychiatric reassessment similarly does not rise to the level of deliberate indifference. Defendant Kassim's work-day ended at 6 pm, and other staff were available to terminate the restraints if they found it appropriate. The record shows it was not appropriate until the following morning, when Plaintiff was calm and able to contract for safety. The cases Plaintiff cites do not change the outcome. In *Hope v. Pelzer*, 536 U.S. 738, 122 S. Ct. 2508, 2514–15, 153 d. 2d 666 (2002), the plaintiff "was treated in a way antithetical to human dignity. . . . hitched to a post for an extended

20

period of time in a position that was painful, and under circumstances that were both degrading and dangerous." Here, Plaintiff was restrained to prevent further self-harm. *Greeno v. Daley*, 414 F.3d 645, 653–54 (7th Cir. 2005) is likewise distinguishable. The plaintiff in *Greeno* received blatantly inappropriate care, exacerbating his medical condition, whereas here, the opposite is true: Plaintiff received adequate care that addressed his mental health status.

Defendant Kassim did not disregard a substantial risk to Plaintiff's health and there is no indication in the record that his professional judgment departed substantially from accepted standards. The claim against him accordingly fails and summary judgment is granted in his favor.

## II. The IDOC Defendants

### A. *Plaintiff raises a triable issue on Defendant Mariscal*

The IDOC Defendants argue that Defendant Mariscal was assigned to Dorm 8 on August 12, 2022, and therefore was not present on Dorm 7; consequently, he could not have been deliberately indifferent towards Plaintiff. [160] at 7-8. Plaintiff responds that Plaintiff's contradictory version of events, testified to under oath, presents a clear jury question that precludes summary judgment. [169] at 4-6. The Court agrees with Plaintiff.

Here, Plaintiff testified that Defendant Mariscal (1) told him to kill himself, and (2) provided him with the illegal contraband and means to do so. Those facts, taken in the light most favorable to Plaintiff (as is required), are evidence of deliberate indifference. *See Duane*, 959 F.2d at 677 (the defendant must have total

unconcern to the plaintiff's welfare in the face of serious risk). Plaintiff was housed on crisis watch, which meant that Defendant Mariscal would have been aware that Plaintiff was a threat to himself or others. It is a reasonable inference in favor of Plaintiff, the non-moving party, that Defendant Mariscal would have known his placing the TV remote would endanger Plaintiff. Further, it is undisputed that Plaintiff was not allowed to have anything besides a safety smock, a safety blanket, and a safety mattress, and only staff had access to TV remotes. A staff member therefore could have introduced it to Plaintiff, and it is reasonable to infer that staff member was Defendant Mariscal, as Plaintiff testified. Finally, although Defendant Mariscal has denied telling Plaintiff to kill himself and denied placing the remote in Plaintiff's cell while he was on crisis watch, the Court cannot resolve a credibility dispute or resolve reasonable inferences in his favor. *See Anderson,* 477 U.S. at 255 (1986). This issue must go before a jury.

Defendant Mariscal's argument that he was not assigned to Dorm 7 is unavailing. Although he was assigned to Dorm 8, there is no indication in the record that he could not have walked over to Dorm 7, had an interaction with Plaintiff, placed the remote in his cell, and subsequently returned to his post. The contemporaneous record itself indicates that Defendant Mariscal reported for assignment to Dorm 7. Although he later stated at his deposition that he "misspoke", the Court must draw reasonable inferences in favor of Plaintiff, not Defendant Mariscal. Defendant Mariscal's assignment to Dorm 8 on the date in question is for the jury to consider in making its credibility determination.

Accordingly, the Court denies summary judgment as to Defendant Mariscal on Plaintiff's Eighth Amendment claim.

### B. Defendants CTO Coates and CTOS Crews

The IDOC Defendants argue that Defendants Coates and Crews were (1) not aware of a specific threat to Plaintiff's health or safety in the form of contraband, (2) Defendant Coates *did* shake down Plaintiff's cell, and (3) they escorted Plaintiff to medical upon seeing blood in his cell, precluding a finding of deliberate indifference. [160] at 8-9. Plaintiff responds that this is a credibility dispute that must go to a jury. [169] at 6-8.

Here, Defendant Coates was the CTO assigned to Plaintiff's dorm on August 15, 2022. He was therefore tasked with shaking down Plaintiff's cell and ensuring no remaining contraband was in Plaintiff's cell. This task was imperative considering Plaintiff's previous self-harming incident that morning. Defendant Coates also reported contemporaneously that after he saw blood on Plaintiff's cell floor, he saw Plaintiff's fingertip and nail were bloody, indicating he reopened the wound with his finger, not broken remote pieces. Plaintiff testified that his cell was not cleared, and he therefore was able to use the broken pieces to self-mutilate. Here, although this set of facts is closer, taking the facts in the light most favorable to Plaintiff, at most shaking down Plaintiff's cell—but failing to remove all broken pieces of the remote— is evidence of negligence. Given Plaintiff's mental health status, his previous self-harming, and the fact that he was on crisis watch, it is possibly even gross negligence. Gross negligence, however, does not rise to the high bar of deliberate indifference.

23

Additionally, after Defendant Coates spotted the blood, he immediately notified his superior, Defendant Crews, and together they escorted Plaintiff to medical. This does not provide enough to allow a rational jury to find in favor of the Plaintiff as to either Defendants Coates or Crews.

Plaintiff cites *Estate of Miller v. Tobiasz*, 680 F.3d 984, 989-991 (7th Cir. 2012) for the proposition that an officer who witnesses a prisoner's self-harm and fails to take reasonable protective measures violates the Eight Amendment. *Estate of Miller* is distinguishable, however, as that case was decided at the pleading stage, not at summary judgment. Further, the Seventh Circuit reasoned that one of the defendants *did* take action, based on the pleadings, and while "she maybe could have communicated… better, that is perhaps only negligence, and even gross negligence does not state a claim for deliberate indifference." *Id.* at 990. The Seventh Circuit nevertheless allowed the claim to go forward because "it is perhaps more prudent to allow plaintiff to proceed with discovery on this claim." *Id.* at 991. In contrast, here, given that (1) the record has been established, and (2) that the evidence establishes that Defendants' actions amounted to at most gross negligence, no rational jury could find Defendants Coates and Crews were deliberately indifferent.

Accordingly, the Court grants summary judgment as to Defendants Coates and Crews on Plaintiff's Eighth Amendment claim.

24

### C. *Defendants CTO Freeman, Hines, and CTOS Walker*

Defendants Freeman, Hines, and Walker argue that they did not place any object in Plaintiff's food and had no knowledge that he was in possession of contraband until he, himself, revealed it. [160] at 9-10. Plaintiff responds that reasonable inferences in his favor preclude summary judgment. [169] at 8-10.

Defendants Freeman and Hines were responsible for bringing Plaintiff his food tray while he was in four-point restraints. Defendant Walker was the assigned supervisor. Defendants claim that while Plaintiff received his limb rotation, he dug an object out of his cheek and spit it on the ground, while accusing them of conspiring to harm him. The record supports that Plaintiff received a disciplinary ticket for this conduct, subsequently being found guilty to the charges of dangerous contraband and giving false information to an employee. Plaintiff, in contrast, claims that a metal shard or piece of glass was placed in his food. He argues that Defendants should have checked his mouth, and he therefore could not have had it in his cheek per IDOC protocol. Additionally, Plaintiff argues that Defendants failed to give him a timely rotation.

Here, Plaintiff's argument fails for two reasons. First, taking the facts in a light most favorable to Plaintiff, if Defendants performed a search of his mouth and therefore *should have* caught the contraband, at most that is gross negligence, not deliberate indifference. Indeed, even if an official fails to alleviate a significant risk that "he should have perceived but did not", liability may not attach. *Farmer*, 511 U.S. 825, 838. Second, the undisputed record belies that Defendants placed the shard

in Plaintiff's food. According to IDOC Defendants (and the attached IDOC disciplinary hearing record, [159-26]), Plaintiff was found guilty in his disciplinary hearing of having dangerous contraband and giving false information to correctional staff; there is consequently no credible dispute that must go before a jury.[2] *See Whitaker v. Dempsey*, 144 F.4th 908, 919 (7th Cir. 2025) ("Courts are not compelled to treat [plaintiff's statement] as true. . . . that is plainly false . . . . when considered alongside the rest of the record.") Lastly, as to the limb rotations, the record supports periodic limb rotations, and instances where Plaintiff himself refused them.

Accordingly, the Court grants summary judgment as to Defendants Freeman, Hines and Walker on Plaintiff's Eighth Amendment claim.

### D. Plaintiff was not discriminated against on the basis of his mental disabilities

IDOC and Defendant Hughes argue that Plaintiff received abundant medical and mental health care while incarcerated at JTC in August of 2022 and his claim therefore fails. [160] at 15. The Court agrees with Defendants.

It is undisputed that Plaintiff's mental health status qualifies as a disability. However, Plaintiff cannot prove the second prong: that he was denied benefit of services, programs, or activities, or otherwise subjected to discrimination by IDOC. The record establishes that Plaintiff was placed at JTC, which is a specialized treatment facility for prisoners with mental illness. While at JTC, he was also placed

---

[2] Plaintiff did not dispute this fact. Rather, in his clarification, [176], he states "[Plaintiff] does not allege that Plaintiff saw anyone *place* an item in his food; rather, he testified that the object that entered his mouth *came* from his food." (emphasis added). *See also* [167] ¶ 29. This clarification does not dispute Defendants' statement that *they* did not place it in his food, nor that Plaintiff was found guilty of having dangerous contraband.

26

in the behavioral management unit, which focused on treatment and building skills to improve decision making. Additionally, Plaintiff received a personalized treatment plan, consisting of individualized care (including psychiatric appointments with Defendant Kassim).

There is no evidence that Plaintiff was denied mental health services, let alone *because* of his mental health disabilities. Accordingly, IDOC and Defendant Hughes are entitled to summary judgment on Plaintiff's ADA and RA claims.

## CONCLUSION

For the reasons explained above, this Court grants the Wexford Defendants' motion for summary judgment [155] and grants in part and denies in part the IDOC Defendants' motion for summary judgment [158]. Defendants Leadinghouse, Kassim, Coates, Crews, Freeman, Walker, Hines, IDOC, and Hughes are terminated as defendants. Count I (Eighth Amendment deliberate indifference) to continue against Defendant Mariscal. Judgment will enter in favor of the defendants on the remaining counts. Status set for April 23, 2026, at 9:30 AM to set a trial date.

E N T E R:

Dated: March 31, 2026

_____
MARY M. ROWLAND
United States District Judge

27